IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN D. KOCHABA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-367-SRF |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |

**MEMORANDUM OPINION**[2]

## I.   INTRODUCTION

Plaintiff  John D. Kochaba ("Kochaba") filed this action pursuant to 42 U.S.C. § 405(g)

on March 16, 2020 against the defendant Kilolo Kijakazi, the Acting Commissioner of the Social

Security Administration (the "Commissioner").  (D.I. 1)  Kochaba seeks judicial review of the

Commissioner's October 30, 2018 final decision, denying Kochaba's claim for disability

insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§

401–434.  Currently before the court are cross-motions for summary judgment filed by Kochaba

and the Commissioner.[3]  (D.I. 17; D.I. 20)  Kochaba asks the court to reverse the

Commissioner's decision and remand for further administrative proceedings.  (D.I. 18 at 20)

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.
Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi is
substituted as Defendant in place of Andrew Saul.
[2] The parties consented to the jurisdiction of a magistrate judge to conduct all proceedings in this
matter through final judgment, and the case was assigned to the undersigned judicial officer on
October 29, 2020.  (D.I. 16)
[3] The briefing for the present motions is as follows:  Kochaba's opening brief (D.I. 18), and the
Commissioner's combined opening brief in support of the motion for summary judgment and
answering brief in opposition to Kochaba's motion (D.I. 21).  Kochaba submitted a notice of no
reply brief.  (D.I. 22)

The Commissioner requests that the court affirm the ALJ's decision. (D.I. 21 at 1) For the reasons set forth below, I recommend that the court DENY Kochaba's motion for summary judgment (D.I. 17), and GRANT the Commissioner's cross-motion for summary judgment (D.I. 20).

## II.     BACKGROUND

### A. Procedural History

Kochaba protectively filed a DIB application on July 28, 2015, alleging a disability onset date of May 14, 2015 due to his multiple sclerosis and asthma. (D.I. 12 at 97, 202-03) Kochaba subsequently amended his disability onset date to October 1, 2016. (*Id.* at 222) Kochaba's claims were denied initially in February 2016 and again on reconsideration in October 2016. (*Id.* at 114-18, 123-27)

At Kochaba's request, an administrative law judge ("ALJ") held a hearing on October 3, 2018. (D.I. 12 at 37-80, 129-30) The ALJ issued an unfavorable decision on October 30, 2018, finding that Kochaba was not disabled under the Act because he could perform a reduced range of light work. (*Id.* at 16-30) The Appeals Council subsequently denied Kochaba's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-9)

Kochaba brought this civil action challenging the ALJ's decision on March 16, 2020. (D.I. 1) Kochaba filed a motion for summary judgment on November 29, 2020 (D.I. 17), and the Commissioner cross-moved for summary judgment on January 29, 2021 (D.I. 20). Kochaba waived the opportunity to file a reply brief. (D.I. 22)

**B. Medical History**

    **1. Medical evidence**

Kochaba was 47 years old on October 1, 2016, his amended disability onset date.  (D.I. 12 at 29)  Kochaba has a high school degree and has past relevant work as a retail salesperson, an employment specialist, and a job coach.  (*Id.* at 29, 43)  The ALJ found that Kochaba had the following severe impairments: multiple sclerosis and asthma.  (*Id.* at 21)  Kochaba challenges the ALJ's consideration of the opinion of his treating neurologist, Dr. Jason Silversteen.  (D.I. 18 at 10-18)  Kochaba also argues that the ALJ erred in her credibility assessment by failing to consider Kochaba's stellar work history.  (*Id.* at 18-20)  Because Kochaba does not challenge the ALJ's decision regarding his asthma, the court does not address it here.

In November 2014, Kochaba visited his primary care physician, Dr. Mark Case, who observed that Kochaba's cognitive function, motor function, and self-care capacity were worsening and his sensory deficits were progressing as expected due to his multiple sclerosis diagnosis.  (D.I. 12 at 386)  Dr. Case referred Kochaba to a neurologist for evaluation and treatment of his worsening multiple sclerosis.  (*Id.* at 388)

Beginning in January 2015, Kochaba received treatment from neurologist Jason Silversteen, D.O. for his multiple sclerosis.  (D.I. 12 at 349)  Dr. Silversteen noted that Kochaba began having symptoms of multiple sclerosis at age 25, but he was treated with steroids and his symptoms did not progress until 2010 when he experienced right optic neuritis and diplopia.  (*Id.*)  An MRI performed at the time revealed numerous enhancing lesions, and he took Rebif for six months before he lost his insurance and stopped treatment.  (*Id.*)  During the January 2015

visit, Dr. Silversteen noted that Kochaba suffered from mild ataxia,[4] occasional diplopia, chronic fatigue, bladder and bowel symptoms, intermittent bilateral numbness in his fingers, and mild cognitive dysfunction.  (*Id.*)  Dr. Silversteen indicated that Kochaba suffered a moderate disability from these symptoms, and it was unclear whether his multiple sclerosis was relapsing or transitioning to progressive.  (*Id.* at 352)

Dr. Silversteen ordered a series of MRIs in February 2015, which revealed multiple lesions throughout Kochaba's thoracic spine, cervical spine, and brain.  (D.I. 12 at 370-72)  Kochaba was subsequently approved to receive medical marijuana, and he started taking Gilenya for his multiple sclerosis flare-ups in April 2015.  (*Id.* at 358)  A brain MRI taken in November 2015 was consistent with the results of the February 2015 scan.  (*Id.* at 469)  In a December 2015 visit with Dr. Silversteen, Kochaba reported that he suffered no side effects from the Gilenya and no new attacks or progression of the disease, although he experienced increasing heaviness in his legs throughout the day.  (*Id.* at 436)

By May 2016, Dr. Silversteen indicated that Kochaba's ataxia and balance symptoms had progressed and worsened, and he had been unable to hold a job due to balance issues and fatigue. (D.I. 12 at 475)  Kochaba also reported problems with numbers, word finding, and memory. (*Id.*)  However, Dr. Silversteen noted no problems with asymmetry, atrophy, or involuntary movements in his motor exam.  (*Id.* at 477)  Also, Kochaba retained full strength in his upper and lower limbs, except his hips.  (*Id.* at 478)

In 2017, Kochaba indicated that his ataxia was worse and Gilenya and Rebif were no

---

[4] "Ataxia, or uncoordinated movement, is an abnormality of muscle control or an inability to finely coordinate voluntary muscle movements, resulting in a jerky, unsteady, to-and-fro motion of the trunk or limbs." *See Forsythe v. Astrue*, 2008 WL 4279573, at n.15 (W.D. Pa. Sept. 18, 2008) (citing medical encyclopedia at Medline Plus).

longer effective for treatment. (D.I. 12 at 574) Kochaba began to use a cane as needed, but he was self-conscious using it. (*Id.*) He began receiving Ocrevus infusions, which made him tired and resulted in no notable changes in his symptoms. (*Id.*) A brain MRI performed in March 2018 revealed stable results. (*Id.*) When Kochaba visited Dr. Silversteen in April 2018, Dr. Silversteen observed that Kochaba's ataxia, balance, and walking were worse, with numbness in his feet. (*Id.*) Kochaba also reported a decline in his cognitive functioning, particularly in his processing speed, attention, and working memory. (*Id.*) Dr. Silversteen recommended physical therapy and continued infusions with Ocrevus. (*Id.* at 577)

### 2.  Medical opinions

On January 30, 2016, Kochaba was examined by Poonam Maru, D.O., a state agency consultant. (D.I. 12 at 448) Dr. Maru noted that Kochaba felt tired easily, with intermittent pain and a heavy sensation in his legs. (*Id.* at 448-49) Kochaba reported that, while he had not had any recent flares, he could not stand for more than one hour at a time and his balance was affected. (*Id.*) Kochaba indicated that he could feed, bathe, and dress himself, cook on occasion, and help with dishes, but each task takes longer and longer to perform and he required frequent breaks. (*Id.* at 449) At the time of the examination, Kochaba was taking Gilenya and medical marijuana. (*Id.* at 448-49)

On examination, Dr. Maru indicated that Kochaba's gate was slightly antalgic, with decreased knee flexion and hip swing and a stride that was decreased in length. (*Id.* at 451) Kochaba had full strength in his upper and lower extremities, except for reduced strength in his hips. (*Id.*) Dr. Maru noted decreased sensation in Kochaba's right leg. (*Id.*) He described Kochaba's fatigue as "slight," and noted that Kochaba's intermittent multiple sclerosis was likely to progress with age. (*Id.*) Dr. Maru anticipated that Kochaba would be able to stand 2 to 4

hours in an 8-hour workday with hourly breaks, and he could walk and sit less than 2 hours with hourly breaks. (*Id.* at 451-52) Dr. Maru opined that Kochaba could carry 20 pounds frequently and 50 pounds occasionally. (*Id.* at 452) Although Dr. Maru indicated that Kochaba could reach, handle, feel, grasp, and finger frequently and bend, stoop, crouch, and squat occasionally, he noted that these abilities may deteriorate over time. (*Id.*) Dr. Maru represented that Kochaba did not require the use of a cane at the time of the examination, but he anticipated that Kochaba "may require a cane for long distances and on uneven terrain." (*Id.* at 451-52) The ALJ assigned little weight to Dr. Maru's opinion, finding that the opinion was inconsistent with examination findings revealing normal strength in Kochaba's extremities and intact range of motion, and it was also inconsistent with Kochaba's ability to perform activities of daily living. (*Id.* at 26)

In February 2016, Kochaba underwent a psychological consultative examination with Robert Thompson, Psy.D. (D.I. 12 at 458-64) Dr. Thompson indicated that Kochaba had no history of mental health treatment, and Kochaba reported that he was unable to work due to his physical conditions. (*Id.* at 460-62) Kochaba was able to drive himself to his appointment and locate the office. (*Id.* at 460) In his evaluation of Kochaba, Dr. Thompson noted no obvious cognitive defects, no difficulty paying attention or maintaining concentration, and no significant memory problems. (*Id.* at 462-64) Dr. Thompson did observe mild impairments in Kochaba's ability to perform daily activities, understand simple instructions, carry out instructions, sustain work performance and attendance, cope with the pressures of ordinary work, and perform routine, repetitive tasks. (*Id.* at 458-59) The ALJ assigned this opinion great weight, finding it consistent with Kochaba's limited mental health treatment and the overall benign findings of his mental exams. (*Id.* at 22)

In October 2016, Kochaba underwent another psychological consultative exam with Ramnik Singh, M.D. (D.I. 12 at 536) Dr. Singh noted Kochaba's staggering gait and his slow walk with the assistance of a cane, but he also observed that Kochaba drove himself to his appointment, arrived on time, and was neatly dressed. (*Id.* at 536-37) Dr. Singh indicated that Kochaba had intact immediate memory and diminished remote memory, and he opined that Kochaba had an overall moderate impairment in all areas of functioning and performing work-related activities. (*Id.* at 537) Dr. Singh concluded that Kochaba had moderate limitations in his ability to comprehend and follow instructions, perform work requiring contact with others, perform simple and complex tasks, and perform repetitive and varied tasks. (*Id.* at 539-40) He diagnosed Kochaba with a mood disorder secondary to his multiple sclerosis. (*Id.* at 538) The ALJ assigned limited weight to Dr. Singh's opinion regarding Kochaba's moderate impairment because the opinion was inconsistent with Dr. Thompson's opinion, Dr. Singh's methodology was subjective, and Kochaba had limited mental health treatment. (*Id.* at 22-23)

In a July 30, 2018 letter, Dr. Silversteen opined that Kochaba's multiple sclerosis was severe, limiting his daily activities and his ability to work on a sustained basis. (D.I. 12 at 544) Dr. Silversteen opined that Kochaba suffered from severe and progressive ataxia; sensory loss in the feet; cognitive difficulties impacting his attention, concentration, and memory; and severe fatigue and leg weakness that worsened every six months. (*Id.*) According to Dr. Silversteen, Kochaba's propensity to fall presented a safety issue, and his fatigue limited his ability to do physical activity for more than ten minutes at a time before requiring a break of one hour or more. (*Id.*)

On a multiple sclerosis medical source statement completed the following month, Dr. Silversteen described Kochaba's severe ataxia, leg weakness, and impaired ability to perform

activities of daily living. (D.I. 12 at 454-46) He represented that Kochaba would be able to sit and stand for 5 minutes at a time and would require breaks every half hour, lasting one to four hours. (*Id.* at 546) Dr. Silversteen advised that the use of a cane would be necessary for occasional standing or walking due to Kochaba's muscle weakness, incoordination, imbalance, and chronic fatigue. (*Id.* at 547) He reported that Kochaba could lift and carry ten pounds occasionally and twenty pounds rarely, but he could never twist, stoop, crouch, or squat. (*Id.*) Dr. Silversteen further opined that Kochaba would only be able to use his hands, fingers, and arms for 15% of an eight-hour workday, and he was likely to be off-task more than 25% of the workday. (*Id.* at 547-48) Dr. Silversteen anticipated that Kochaba was likely to be absent more than four days per month, and he would be unable to perform even "low stress" work due to the progression of his multiple sclerosis. (*Id.* at 548) The ALJ assigned little weight to Dr. Silversteen's opinions, concluding that the restrictive limitations imposed by Dr. Silversteen were inconsistent with his treatment notes and MRI results indicating that Kochaba's multiple sclerosis was stable and not progressing. (*Id.* at 27)

### 3. Nonmedical evidence

Kochaba's wife provided an undated statement regarding Kochaba's condition. In her statement, Mrs. Kochaba indicated that she is no longer able to exercise as frequently as she used to and is stressed and anxious as a result of Kochaba's condition. (D.I. 12 at 341) She explained that she and Kochaba used to go mountain biking, fishing, ride their motorcycles, and take their dogs for long walks. (*Id.* at 341-42) At the time of her statement, however, Kochaba shuffled his feet when he walked and had difficulty not tripping. (*Id.* at 342) He could no longer perform many household chores. (*Id.*) She stated that they go to church, visit their parents, attend doctor's appointments, and run errands, but she would always drive. (*Id.*)

Kochaba's former employer, Potts Welding & Boiler Repair Co., Inc., also submitted a statement dated March 28, 2017 regarding Kochaba's condition. (*Id.* at 337) The statement reports that Kochaba had difficulty walking and fell into a tool cage on his first day of work, and he later fell again. (*Id.*) Later that week, Kochaba resigned because the job was more than he could handle with his condition, and his employer expressed gratitude that he resigned before getting seriously hurt. (*Id.*)

### C. Hearing Before the ALJ

#### 1. Kochaba's Testimony

At the administrative hearing on October 3, 2018, Kochaba testified that he previously worked as a welder and pipefitter. (D.I. 12 at 43-45) These positions required him to constantly be on his feet and lift heavy objects. (*Id.* at 45) Kochaba also briefly worked as a motorcycle mechanic for two months in 2016. (*Id.* at 47) He stopped working in 2017 after being let go by his employer for an unspecified reason. (*Id.* at 48) Kochaba testified that he had difficulty walking, being on his feet, and working in hot temperatures in his last position. (*Id.*)

Kochaba testified that he lives with his wife and stepdaughter. (*Id.* at 49) Since being diagnosed with multiple sclerosis, Kochaba stated that he experiences a burning pain in his legs that progresses throughout the day, and he has trouble balancing and lifting up his feet so as not to trip when he walks. (*Id.* at 49-50, 52) He also indicated that he has vision, memory, and cognitive issues resulting from his multiple sclerosis, among other things. (*Id.* at 50) He relies on his wife to help him remember doctor's appointments and bill payments. (*Id.* at 51)

Kochaba explained that he can sit for a couple hours before needing to recline for one to two hours to alleviate his leg and hip cramps. (*Id.* at 53) He can stand for only about five minutes. (*Id.* at 54) He is self-conscious about using his cane to walk in public and does not use

9

it as much as he should.  (*Id.*)  He does not sleep well during the night and experiences chronic

fatigue during the day.  (*Id.* at 54-55)  As a result, he generally needs to rest within a couple of

hours of attempting a task.  (*Id.* at 55)

Kochaba also indicated that he has trouble with his memory and concentration on a daily

basis.  (*Id.* at 56)  With respect to his asthma, Kochaba testified that he is sensitive to dust,

temperature extremes, and humidity.  (*Id.* at 56-57)  As a result of his multiple sclerosis and

asthma, Kochaba has experienced mood changes resulting in depression, irritability, frustration,

and reduced social activity.  (*Id.* at 57)

Kochaba has tried a number of experimental medications to treat his multiple sclerosis,

including Prednisone, Rebif injections, Gilenya, and bi-annual Ocrevus infusions.  (*Id.* at 57-58)

Kochaba reports no major side effects from the medications beyond swelling at the injection site

and cold-like symptoms.  (*Id.* at 58)

With respect to his activities of daily living, Kochaba testified that he does not read or

frequently use a computer due to problems with his vision.  (*Id.* at 60)  He is able to vacuum one

room and wash his own clothes, but he has difficulty remembering when there are clothes left in

the washing machine.  (*Id.* at 61)  He does not go grocery shopping and only runs limited

errands.  (*Id.*)  He is able to sit through weekly church services without difficulty, and he visits

his parents and eats out at a restaurant about once a week.  (*Id.* at 62)  As of the date of the

hearing before the ALJ, Kochaba intended to sell his motorcycle because he was no longer able

to ride it comfortably.  (*Id.* at 62-63)  He has difficulty showering and putting on socks.  (*Id.* at

63)

### 2.  Vocational Expert Testimony Before the ALJ

At the administrative hearing in October 2018, the ALJ posed the following hypothetical

to vocational expert Adina Leviton ("the VE"):

> [P]lease assume an individual of the Claimant's age, education and experience. If
> such an individual is able to perform sedentary work, occasionally climb ramps,
> stairs, ladders, ropes and scaffolds. Frequently balance and stoop. Occasionally
> kneel, crouch and crawl. Tolerate occasional exposure to extreme cold, extreme
> heat, humidity, vibrations, fumes, odors, dusts, gases, poor ventilation and
> hazards, such as moving machinery and unprotected heights.

(D.I. 12 at 69)  In response to the ALJ's hypothetical, the VE testified that such a hypothetical

individual would not be able to perform Kochaba's past work as a pipefitter and welder. (*Id.* at

68-69)  However, the ALJ indicated that such a hypothetical individual could perform work at

the sedentary level as a taper who printed circuit boards, a final assembler, or a loader for

semiconductor dies. (*Id.* at 69)  The ALJ then modified the hypothetical to include the ability to

frequently reach bilaterally and frequently finger and handle bilaterally. (*Id.*)  The VE testified

that the hypothetical individual could work in the taper position or the final assembler position,

and he could also work as an addresser, but the loader position would not be available. (*Id.* at

69-70)  The VE also testified that a hypothetical individual who could perform simple, routine

and repetitive tasks, frequently interact with supervisors and co-workers, and occasionally

interact with the public could perform each of these three positions. (*Id.* at 70)

The ALJ once again modified the description of the hypothetical individual to add a

requirement that the individual rarely needs use of a cane for ambulation and is able to navigate

uneven surfaces no more than occasionally. (*Id.*)  The VE opined that the use of a cane would

have a minimal impact on the sedentary work proposed for the hypothetical individual. (*Id.* at

71)  In response to questioning by the ALJ, the VE also represented that the hypothetical

individual's ability to read from a computer screen would be a nonissue because the listed jobs

do not require computer work or the ability to read printed material in typical font more than

frequently. (*Id.* at 71-72)

11

Kochaba's counsel then asked the VE to consider the hypothetical individual with concentration and attention limitations that would put them off-task about 25% of the eight-hour workday or more. (*Id.* at 72) The VE explained that such an individual would not be able to maintain employment. (*Id.*) The VE testified that a hypothetical individual could not have a loss of productivity greater than 15 to 20% for the types of entry level, unskilled, sedentary jobs listed by the VE. (*Id.* at 72-73) If the hypothetical individual were to need an unscheduled break of one to four hours during the eight-hour workday, the VE testified that this individual would not be able to perform the listed positions. (*Id.* at 73) Similarly, the VE testified that a hypothetical individual experiencing difficulties understanding the requirements of the job or requiring frequent prompts or reminders in the routine work setting for more than thirty days would not be able to maintain employment in the listed positions. (*Id.* at 74-76)

Kochaba's counsel also asked whether a hypothetical individual who was limited in using their hands, fingers, and arms for grasping, turning, and twisting objects, for fine manipulation, and for reaching in front of their body for only 15% of the eight-hour workday would be able to perform any work. (*Id.* at 76) The VE represented that such an individual would not be able to perform any jobs in the economy due to the loss of productivity. (*Id.*) The VE further stated that a hypothetical individual who consistently misses four or more days of work per month, or who falls once a day due to balance issues, would not be able to maintain employment. (*Id.* at 77)

**D. The ALJ's Findings**

Based on the factual evidence in the record and the testimony by Kochaba and the VE, the ALJ determined that Kochaba was not disabled under the Act for the relevant time period beginning on October 1, 2016. (D.I. 12 at 19) The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2021.

12

2. The claimant has not engaged in substantial gainful activity since October 1, 2016, the amended alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: multiple sclerosis and asthma (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can occasionally climb, kneel, crouch and crawl; frequently balance and stoop; occasionally have exposure to extreme cold, extreme heat, humidity, vibration, fumes, odors, dusts, gases, poor ventilation and hazards; frequently reach bilaterally; frequently finger and handle bilaterally; and, must be required to walk on uneven surfaces no more than frequently. Further, the claimant must be able to utilize a cane for ambulation rarely. He is limited to performing simple, routine and repetitive work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on May 4, 1969 and was 47 years old, which is defined as a younger individual age 45-49, on the amended alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2016, through the date of this decision (20 CFR 404.1520(g)).

(D.I. 12 at 21-30)

## III.    STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether substantial evidence supports the decision.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "Substantial evidence means enough relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Pearson v. Comm'r of Soc. Sec.*, 839 F. App'x 684, 687 (3d Cir. 2020) (quoting *Biestek*, 139 S.Ct. at 1154).  When applying the substantial evidence standard, the court "looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*, 139 S. Ct. at 1154 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The threshold for satisfying the substantial evidence standard is "not high[,]" requiring "more than a mere scintilla" of evidence.  *Id.*

## IV.    DISCUSSION

### A.  Disability Determination Process

Title II of the Act affords insurance benefits to people who contributed to the program and who have a disability.  *See Pearson*, 839 F. App'x at 687 (citing 42 U.S.C. § 423(a)(1)).  A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A claimant is only disabled if the impairments are so severe that they preclude a return to previous work or engagement in any other kind of substantial gainful work existing in the national economy.  *Id.* at § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).  To qualify for disability insurance benefits, a claimant must establish disability prior to

14

the date last insured. 20 C.F.R. § 404.131 (2016); *Zirnsak v. Colvin*, 777 F.3d 607, 611-12 (3d Cir. 2014).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii).

If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See id.* §§ 404.1520(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. *See id.* §§ 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428. A claimant's RFC "measures the most she can do despite her limitations." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)) (internal

quotations and alterations omitted).  The claimant bears the burden of demonstrating the inability

to return to past relevant work.  *See Plummer*, 186 F.3d at 428

     If the claimant is unable to return to past relevant work, at step five, the Commissioner

must demonstrate that the claimant's impairments do not preclude an adjustment to any other

available work.  *See* 20 C.F.R. §§ 404.1520(g); *Plummer*, 186 F.3d at 428.  In other words, the

Commissioner must prove that "there are other jobs existing in significant numbers in the

national economy which the claimant can perform, consistent with her medical impairments, age,

education, past work experience, and [RFC]."  *Plummer*, 186 F.3d at 428.  The ALJ must

analyze the cumulative effect of all the claimant's impairments in determining whether he or she

is capable of performing work and is not disabled.  *See id.*  The ALJ often seeks the VE's

assistance in making this finding.  *See id.*

### B.  Whether the ALJ's Decision is Supported by Substantial Evidence

     Kochaba's motion for summary judgment focuses on two overarching issues: (1)

insufficiencies in the ALJ's evaluation of Dr. Silversteen's opinion; and (2) insufficiencies in the

ALJ's credibility assessment of Kochaba's subjective complaints.

#### 1.  Evaluation of treating specialist opinion

     The Third Circuit subscribes to the "treating physician doctrine," which requires a

treating medical source's opinion to be given controlling or substantial weight if it is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the claimant's] case record."  *Fargnoli v.*

*Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); *Mason v. Shalala,* 994 F.2d 1058, 1067 (3d Cir.

1993); *see also* 20 C.F.R. § 404.1527(c)(2).  In cases where the treating source opinion is either

inconsistent with other substantial evidence or not well-supported by objective medical findings,

the opinion may be given less than controlling weight, but it should not be automatically

rejected. *See* S.S.R. 96-2p, 1996 WL 374188, at *4 (July 2, 1996); *Gonzalez v. Astrue*, 537 F.

Supp. 2d 644, 660 (D. Del. 2008).  Instead, the treating source opinion should be afforded the

appropriate amount of deference in accordance with the factors listed in 20 C.F.R. § 404.1527,[5]

which include the length of the treatment relationship, the frequency of examination, the nature

and extent of the treatment relationship, the supportability and consistency of the opinion, and

the specialization of the treating physician.  20 C.F.R. § 404.1527(c).  The ALJ need not

explicitly discuss each factor under 20 C.F.R. § 404.1527(c), so long as the ALJ's consideration

of the evidence is presented clearly enough to allow for judicial review.  *See Samah v. Comm'r*

*of Soc. Sec.*, 2018 WL 6178862, at *5 (D.N.J. Nov. 27, 2018) (quoting *Laverde v. Colvin*, 2015

WL 5559984, at *6 (W.D. Pa. Sept. 21, 2015)).

Although the ALJ may make credibility determinations when the record contains

inconsistent or conflicting evidence, the ALJ "cannot reject evidence for no reason or the wrong

reason." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Mason*, 994 F.2d at 1066).

Accordingly, the ALJ must provide specific reasons for the weight given to the treating source's

medical opinion based on the evidence in the record.  S.S.R. 96-2p, 1996 WL 374188, at *5; *see*

*Dass v. Barnhart*, 386 F. Supp. 2d 568, 576 (D. Del. 2005).  Otherwise, the reviewing court

cannot judge whether "significant probative evidence was not credited or if it was simply

ignored." *Fargnoli*, 247 F.3d at 41; *see Simmonds v. Astrue*, 872 F. Supp. 2d 351, 358 (D. Del.

2012); *Gonzalez*, 537 F. Supp. 2d at 660.  Importantly, the ALJ may not reject a treating

---

[5] 20 C.F.R. § 404.1527 was superseded by 20 C.F.R. § 404.1520c for claims filed on or after
March 27, 2017.  Because Kochaba's claim was filed prior to this date, 20 C.F.R. § 404.1527
remains in effect.

physician's opinion based on "his or her own credibility judgments, speculation, or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).

Kochaba argues that the ALJ failed to properly weigh Dr. Silversteen's medical opinion under the factors identified at 20 C.F.R. § 404.1527(c) by not accounting for Dr. Silversteen's "reasonable knowledge" of Kochaba's impairments, his expertise as a neurologist specializing in multiple sclerosis, and his lengthy treatment relationship with Kochaba. (D.I. 18 at 11-18) According to Kochaba, the ALJ provided inadequate reasons for rejecting the limitations suggested by Dr. Silversteen, instead substituting her own inaccurate interpretation of the treatment notes for Dr. Silversteen's opinion. (*Id.* at 14) Kochaba notes that the opinions of the State Agency medical consultants were given prior to the amended disability onset date and, as such, Dr. Silversteen's opinion is the only medical opinion of record addressing Kochaba's multiple sclerosis during the relevant period. (*Id.* at 17-18)

In response, the Commissioner contends that the ALJ appropriately discounted Dr. Silversteen's opinion because it was inconsistent with his own treatment notes. (D.I. 21 at 13-15) Specifically, the Commissioner notes that Dr. Silversteen's objective findings remained stable except for Kochaba's worsening ataxia, which was addressed in the ALJ's RFC limiting Kochaba to sedentary work with limited postural movements, limited walking on uneven surfaces, and the ability to use a cane. (*Id.* at 13-17)

Substantial evidence supports the ALJ's decision to afford the opinion of Dr. Silversteen little weight. *See Scouten*, 722 F. App'x at 290. Kochaba highlights portions of Dr. Silversteen's treatment notes featuring his progressing ataxia, worsening fatigue, and use of a cane. (D.I. 18 at 15) But the ALJ acknowledged these portions of the record in the October 30, 2018 decision and accounted for Kochaba's "ataxic gait, slightly reduced muscle strength in his

18

extremities, and progressing symptoms of weakness and heavy feeling in his lower extremities"
in her RFC assessment based on Dr. Silversteen's treatment notes and the medical records as a
whole. (D.I. 12 at 26-28)  In accordance with Dr. Silversteen's description of Kochaba's
symptoms, the ALJ limited Kochaba to a reduced range of sedentary work with postural
limitations, restrictions on exposure to hazards and vibration, and accommodations for the use of
a cane,[6] and indicated that Kochaba should be limited to performing simple, routine, and
repetitive tasks. (*Id.* at 27-28)

     The ALJ rejected the balance of Dr. Silversteen's opinions regarding Kochaba's
limitations for three reasons.  First, the ALJ opined that the limitations set forth in Dr.
Silversteen's Medical Source Statement and opinion letter were inconsistent with Dr.
Silversteen's own treatment notes reflecting stable symptoms and consistent medication for
Kochaba's multiple sclerosis. (D.I. 12 at 27)  The record before the court contains substantial
evidence supporting the ALJ's conclusion.  For example, Dr. Silversteen's opinion that Kochaba
could not sit or stand for more than five minutes at a time in an eight-hour workday is not
supported by his objective exam findings consistently representing that Kochaba had no atrophy
or involuntary movements, he had normal muscle tone and posture, and he had 5/5 strength in his
upper and lower extremities except for slightly reduced strength in his hip flexors. (*Id.* at 546-
48, 473, 477-78, 576, 581, 585, 589, 593)  The ALJ also cited evidence consistent with the
benign examination findings indicating that Kochaba could care for his personal hygiene,

---

[6] Dr. Silversteen's opinion that Kochaba required the use of a cane to counteract progressing
muscle weakness and imbalance is not entirely consistent with his most recent treatment notes
from April 2018, when he observed that Kochaba "uses [a] cane when needed" but "no more
than previous." (D.I. 12 at 574)  The ALJ's RFC analysis accounts for Kochaba's use of a cane
on occasion, consistent with Dr. Silversteen's examination notes. (*Id.* at 28) ("The claimant must
be able to utilize a cane for ambulation rarely. . . .").

prepare meals, and perform light housework.  (*Id.* at 26)  The ALJ was not obligated to adopt the

sit/stand limitations proposed by Dr. Silverstein.  *See Titterington v. Barnhart*, 174 F. App'x 6,

11 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular

findings that an ALJ adopts in the course of determining an RFC.").

 The ALJ's decision to give little weight to Dr. Silversteen's opinion regarding the

severity of Kochaba's symptoms is further supported by Dr. Silversteen's treatment records

showing that Kochaba took a consistent dose of Gilenya from April 2015 through May 2017.

(D.I. 12 at 586-87, 590)  The consistency of Kochaba's medication supports the ALJ's

conclusion that the treatment was effective at controlling Kochaba's condition and the

medication had no serious side effects.  (*Id.*)  Dr. Silversteen's treatment notes suggest that

Kochaba's switch from Gilenya pills to Ocrevus infusions resulted from the approval of the drug

between February and May 2017, and not from any adverse effects or ineffectiveness of

Kochaba's previous treatment.  (*Id.* at 590, 593-94)  Dr. Silversteen's treatment notes reflect that

he prescribed Provigil in November 2017 "as needed for fatigue" after Kochaba began biannual

Ocrevus infusions, which left Kochaba "very tired . . . for a day or two."  (*Id.* at 577, 582)

Subsequent treatment notes from April 2018 suggest that Dr. Silversteen addressed ataxia,

ambulation, balance, numbness, and cognitive dysfunction with Kochaba, but Kochaba's fatigue

was not specifically discussed beyond renewing his prescription for Provigil.  (*Id.* at 574-75)

 Second, the ALJ assigned little weight to Dr. Silversteen's opinion because a March 2018

MRI revealed stable findings.  (D.I. 12 at 27)  Kochaba underwent three MRIs on his brain

between November 2015 and March 2018, and each one revealed multiple T2 hyperintense

lesions in the deep cortical, subcortical, periventricular, and temporal white matter, as well as the

posterior fossa.  (*Id.* at 670, 672, 674)  Consistent with the previous MRI results, the March 2018

results revealed no acute enhancing lesions, and it was noted that there was "no interval change" compared to the prior study. (*Id.* at 674) These MRI results provide additional support for the ALJ's conclusions regarding the weight to be given Dr. Silversteen's opinion about Kochaba's ability to work. *See Gunn v. Saul*, 2021 WL 2374348, at *10 (D.N.J. June 10, 2021) (concluding that ALJ's RFC determination was supported by mild to moderate MRI results, conservative treatment, stable symptomology, and normal motor and sensory findings); *see also Dunn v. Astrue*, 2010 WL 3291591, at *4 (S.D. Ga. July 21, 2010) (finding that stable MRI results showing no progression of condition supported the ALJ's decision to discount treating physician's opinion that was inconsistent with that physician's medical records and test results).

Finally, the ALJ considered the records of Kochaba's primary care physician, Dr. Case, in assigning little weight to Dr. Silversteen's opinion. (D.I. 12 at 27) Kochaba stresses that Dr. Case primarily treated Kochaba for asthma and other non-severe impairments. (D.I. 18 at 17; D.I. 12 at 399, 517, 526, 610, 614, 618, 627, 631, 635) Nonetheless, Dr. Case's treatment records throughout and before the relevant time period consistently document the symptoms of Kochaba's multiple sclerosis, noting that Kochaba's cognitive and motor functions are "progressing as expected and not worsening," as are his self-care capacity and sensory deficits. (D.I. 12 at 399, 517, 526, 610, 614, 618, 627, 631, 635) Dr. Case's treatment notes spanning from August 2015 to September 2018 provide further support for the ALJ's decision to afford Dr. Silversteen's opinion little weight. The opinion of a treating source is not entitled to controlling or deferential weight where, as here, the opinion is not supported by the treating source's clinical findings and it is inconsistent with other medical evidence of record. *See Smith v. Astrue*, 359 F. App'x 313, 316 (3d Cir. 2009) (concluding that a treating source's "medical opinion [which] is contradicted by several pieces of evidence in the record and also contains

internal inconsistencies . . . is not entitled to the level of deference otherwise accorded to a treating physician's opinion.").

Kochaba faults the ALJ for failing to expressly consider each of the factors identified at 20 C.F.R. § 404.1527(c). (D.I. 18 at 13)  But the ALJ is not required to explicitly discuss each factor under 20 C.F.R. § 404.1527(c), so long as the ALJ's consideration of the evidence is presented clearly enough to allow for judicial review. *See Hinson v. Saul*, C.A. No. 19-1782-SRF, 2020 WL 6561247, at *8 (D. Del. Nov. 9, 2020) (citing *Samah v. Comm'r of Soc. Sec.*, 2018 WL 6178862, at *5 (D.N.J. Nov. 27, 2018)).  Here, the ALJ confirmed that the opinion evidence was considered in accordance with the requirements of 20 C.F.R. § 404.1527 and proceeded to consider the supportability and consistency of Dr. Silversteen's opinion in conjunction with his own treatment notes, the MRI results, and other medical evidence of record such as Dr. Case's examination notes. (D.I. 12 at 24-25, 27-28)  The ALJ also summarized Dr. Silversteen's treatment records between May 2016 and April 2018, acknowledging the length and frequency of Kochaba's treatment. (*Id.* at 26-27)  Consequently, substantial evidence supports the ALJ's determination with respect to Dr. Silversteen's opinion because it is "inconsistent with the other substantial evidence in [the] case record." *Scouten*, 722 F. App'x at 290 (quoting 20 C.F.R. § 404.1527(c)(2)).

### 2.  Credibility assessment

Kochaba also contends that the ALJ's credibility assessment of his self-described limitations is defective because the ALJ did not consider Kochaba's strong work history. (D.I. 18 at 19-20)  In response, the Commissioner alleges that the ALJ properly rejected Kochaba's subjective complaints after concluding that they were not supported by the medical evidence. (D.I. 21 at 17-18)  The Commissioner further argues that a claimant's work history cannot, by

itself, bolster the claimant's credibility.  (*Id.* at 19)

Here, Kochaba's subjective complaints are not fully supported by the evidence of record for the reasons previously discussed at § IV.B.1, *supra*, and the ALJ limited Kochaba to a reduced range of sedentary work involving simple, routine, and repetitive tasks to accommodate his complaints of weakness and heaviness in his legs as well as his difficulty concentrating.  (D.I. 12 at 27-28)  The law is well-established that the ALJ's failure to afford Kochaba heightened credibility based solely on his work history does not amount to an error requiring remand.  *See Corley v. Barnhart*, 102 F. App'x 752, 755 (3d Cir. 2004) ("[T]he ALJ did not err by failing to afford Corley heightened credibility based solely on his work history.").  An ALJ's failure to explicitly consider a claimant's lengthy record of continuous work is not subject to remand where, as here, the ALJ's credibility determination is based on an explanation of the substantial evidence of record supporting the ALJ's decision.  *See Sanborn v. Comm'r of Soc. Sec.*, 613 F. App'x 171, 177 (3d Cir. 2015) (finding that "the ALJ's credibility determination . . . based on a broad view of the record . . . would have been supported by substantial evidence regardless of whether the ALJ had explicitly considered [the claimant's] employment history.").

## V.    CONCLUSION

For the foregoing reasons, Kochaba's motion for summary judgment (D.I. 17) is DENIED, and the Commissioner's cross-motion for summary judgment (D.I. 20) is GRANTED. An Order consistent with this Memorandum Opinion shall issue.


Dated:  October 1, 2021

Sherry R. Fallon
United States Magistrate Judge